IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 18, 2018

## DANE SAYLES, ALIAS BRADLEY HARPER v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Hamilton County
### No. 293077   Thomas C. Greenholtz, Judge

_____

### No. E2018-00141-CCA-R3-PC

_____

The Petitioner, Dane Sayles, appeals the Hamilton County Criminal Court's denial of his petition for post-conviction relief from his conviction of possession of three hundred grams or more of cocaine for resale and resulting forty-year sentence as a Range II, multiple offender. On appeal, the Petitioner contends that the post-conviction court erred by refusing to apply Riley v. California, 134 S. Ct. 2473 (2014), which prohibits the warrantless search of an arrestee's cellular telephone incident to arrest, retroactively. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Donna Robinson Miller, Chattanooga, Tennessee, for the appellant, Dane Sayles.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; M. Neal Pinkston, District Attorney General; and Kevin Taylor Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

This case relates to a traffic stop of a rental car in which Marcus Harper was the driver and the Petitioner was the passenger. The Hamilton County Grand Jury indicted each of them for possessing three hundred grams or more of cocaine for resale. State v. Dane Sayles, No. E2012-00138-CCA-R3-CD, 2013 WL 1870058, at *1 (Tenn. Crim.

App. at Knoxville, May 3, 2013).   After a joint trial, the jury convicted them of the offense.  Id. at *10.

On direct appeal of the Petitioner's conviction, this court gave the following factual account of his crime:

The State called Mark Hamilton as its first witness at trial.  Mark Hamilton, employed through the [Chattanooga Police Department (CPD)], testified as an expert in forensic technology, with an emphasis in cell phone and audio enhancement.  On April 5, 2010, Sergeant [Jason] Lewis had requested that Hamilton enhance the "audio for intelligibility on a DVD video."  The video was from a camera mounted within Sergeant Lewis' vehicle.  Sergeant Lewis wanted Hamilton to attempt to reduce the peripheral noise such as air conditioning and passing cars and trucks.  Hamilton was able to reduce this "white noise" using a noise reduction software to make conversations on the video more understandable.  He then converted the video back to a standard DVD format.

Hamilton testified that Sergeant Lewis also requested that he extract and analyze data from two cell phones:  a Blackberry Pearl and a Nokia.  Hamilton went to where the phones were stored by the department and checked them out for examination from March 18 until March 19 of 2010.  Regarding the Nokia phone, he noticed that it was a "flip phone[ ]," but the phone would not stay closed.  He charged the battery, placed it in a container that would disable the phone signal, and extracted the information from the phone onto a compact disc ("CD").  He completed a similar procedure in extracting from the Blackberry all data except the music.

Hamilton read from a report regarding a specific text message that was received on the Nokia phone at 8:28 p.m. on April 28, 2008.  Then, he identified the same text message sent from the Blackberry phone at 8:26 p.m.  Hamilton also identified a screen shot of the Blackberry phone displaying a text message that matched the content and date recorded in the report.

Officer Dale Lockhart with the Hamilton County Sheriff's Department testified that he previously was employed with the Dunlap Police Department and the CPD.  He was a member of the CPD highway interdiction team for approximately five years.  On April 28, 2008, Officer Lockhart was patrolling interstate 75 northbound in Hamilton County, which included his use of radar.  At one point he observed a vehicle in

which the co-defendants were traveling. According to his radar, the vehicle was traveling sixty-six miles per hour in a fifty-five mile per hour zone. Officer Lockhart also observed the vehicle make an improper lane change and fail to use its blinker. He pulled behind the vehicle and stopped the vehicle at the next safe location. On cross-examination, he acknowledged that, in his report, he noted that he watched the improper lane change before observing the vehicle speeding. He identified the co-defendant as the driver and the Defendant as the passenger.

Officer Lockhart approached the passenger side of the vehicle and asked the codefendant for his driver's license and proof of insurance. He noticed that the co-defendant seemed "nervous" and handed Officer Lockhart his entire wallet, rather than simply his driver's license. The co-defendant told him that the vehicle was a rental car, so he asked the co-defendant for the rental agreement. The Defendant retrieved the agreement from the glove compartment for Officer Lockhart. Officer Lockhart observed that the Defendant "was breathing hard" and "never made eye contact" with him.

Officer Lockhart noticed that the rental agreement indicated that the vehicle was rented in [Twanda] Campbell's name. He identified this agreement in court and noted that the phone number for Campbell and Hertz were not listed anywhere on the document. Upon making this observation at the scene, he returned to the rental vehicle and asked the co-defendant to step out of the car. The co-defendant explained that the Defendant's girlfriend had rented the car for them. The co-defendant called the Defendant his "uncle," and when Officer Lockhart asked him what was the Defendant's name, the co-defendant said, "[Y]ou want me to go ask him[?]" Officer Lockhart responded, "[N]o, I just figured you would know your uncle's name." When the co-defendant offered to go ask the Defendant, Officer Lockhart declined and stated that he would speak with the Defendant.

The co-defendant told Officer Lockhart that they were traveling from Atlanta, Georgia, to Pittsburgh, Pennsylvania, to visit his sister who was having a kidney transplant. The co-defendant could not tell Officer Lockhart the name of the hospital or where it was located. Another officer who arrived at the scene stayed with the co-defendant while Officer Lockhart again approached the vehicle to speak with the Defendant.

Officer Lockhart asked the Defendant for his ID, and the Defendant gave Officer Lockhart a passport and explained that he did not have a driver's license. The name on the passport was "Dane M. Sayles." Upon further investigation into the passport, Officer Lockhart learned that the Defendant's name was Bradley Melvin Sayles. The passport contained a Pennsylvania address, but the Defendant told Officer Lockhart that he lived in Atlanta. The Defendant explained that they were traveling to Pittsburgh. When Officer Lockhart asked, however, if anyone was sick, the Defendant responded, "[N]o, nobody's sick. We're just going to visit." At this point, Officer Lockhart developed a suspicion of criminal activity.

Officer Lockhart then returned to the co-defendant and informed him that there were discrepancies in the co-defendants' stories. He asked the co-defendant whether they had anything illegal in the vehicle, listing specific items. The co-defendant denied having anything illegal in the vehicle, but, when asked specifically about cocaine, he turned and looked at the vehicle. Officer Lockhart requested permission to search the vehicle, and the co-defendant declined. The co-defendant continued to exhibit a "nervous energy," which gave Officer Lockhart the indication that "something was not right."

Officer Lockhart returned to his vehicle and called to request a K-9 unit. He then walked back toward the co-defendant and notified him that the K-9 unit was on its way. At that point, the co-defendant stated that he wanted Officer Lockhart to search the vehicle rather than use the K-9 unit. Accordingly, Officer Lockhart called and cancelled the request for the K-9 unit. He asked the Defendant to step out of the vehicle and to join the co-defendant while he searched the vehicle. As Officer Lockhart initially looked into the vehicle, he noticed that the seatbelts in the back seat were stuffed between the seat cushions, which seemed to be "an indicator," given that the vehicle appeared relatively new. After looking through the front of the vehicle, he lifted up the backseat and found "the first kilo of cocaine."

At this point, Officer Lockhart pulled out his taser, returned to the co-defendants, and placed both of them in handcuffs. He could not remember whether he informed them at that time as to why he was placing them in custody. Officer Lockhart placed the co-defendant in his patrol vehicle and left the Defendant near the front of the vehicle while he returned to the rental vehicle to again look beneath the back seat. This time, he found "another kilo of cocaine . . . on the other side under the back seat."

Officer Lockhart placed the "two kilos" of cocaine on the back of the rental vehicle and placed the Defendant in the back of his patrol vehicle with the co-defendant. At that time, Officer Lockhart also found $1,927 in cash in the possession of the Defendant.

Officer Lockhart testified that the rental vehicle was towed to the narcotics office of the department. He identified a picture of a text message displayed on the confiscated Blackberry which read, "I'm about to go out of town real quick. I'll be back tomorrow. My mom going to pick up or pick you up. Her number." He also identified other text messages that read, "[W]ould you tell me if you were going to make a run" and "We're going to work." From the Nokia cell phone, Officer Lockhart identified a picture of a text message that read, "They want to search the car." Officer Lockhart asked both co-defendants if they were working, and both individuals stated that they did not have a job at that time.

Officer Lockhart next identified business cards that he found inside a small phone book found at the scene. The State played the video from Officer Lockhart's patrol vehicle for the jury. On cross-examination, Officer Lockhart agreed that he had watched the video approximately three or four times and had watched the video before writing his report. He also acknowledged that the video did not depict the vehicle's improper lane change or failure to use its blinker.

Officer Lockhart also acknowledged that, shortly after informing the co-defendant that he had requested a K-9 unit, he turned off his microphone for five minutes. He and the codefendant also were out of the view of the camera during that time. Five minutes later, the video depicted Officer Lockhart again ask the co-defendant, "Now, I can search, right," to which the co-defendant consented. Additionally, although Officer Lockhart previously had testified that he did not observe any items in the back seat of the vehicle, he acknowledged a photograph from the scene depicting either a black bag or jacket in the back seat.

. . . .

Sergeant Jason Lewis of the CPD testified that he was assigned as a supervisor over the special investigations division. On April 28, 2008, he received a call from Officer Lockhart to join Officer Lockhart at the scene on Interstate 75. By the time that Sergeant Lewis had arrived at the scene,

Officer Lockhart had found the cocaine, and Sergeant Lewis believed the cocaine already was outside of the vehicle. He could not remember whether he or Officer Lockhart took the photographs at the scene.

Sergeant Lewis identified the Blackberry cell phone as belonging to the co-defendant and the Nokia cell phone as belonging to the Defendant. He agreed that he searched both phones for text messages and took pictures of text messages retrieved from both phones. He confirmed that he was the officer who sent the controlled substance to the crime laboratory. He also was the person who downloaded the video from Officer Lockhart's camera to a disc in its original form before it was enhanced.

. . . .

Gerald W. Smith, the corporate security manager for the Hertz Corporation in Atlanta, Georgia, testified regarding the process for vehicle rentals and returns. He stated that, upon the return of [a] rental vehicle, "[t]he car is then cleaned, refueled and vacuumed and washed." Although it would depend on the type of vehicle, he stated that the rear seat usually would not be lifted up. He also explained the process for designating multiple authorized users for a rental vehicle as follows: "They would need a credit card and driver's license just like renting the vehicle themself. And there would be an additional operator form that would be filled out and it would accompany the rental agreement." The rental agreement itself would not list the additional authorized users, but the agreement would list an extra charge associated with that additional driver.

Smith identified a rental agreement between Hertz and the individual who rented the rental vehicle prior to [Twanda] Campbell in this case. According to documentation, the vehicle was returned to Hertz by this individual, Catherine Love, on April 28, 2008, the same day it was rented by Campbell. The contract specified that Love rented the vehicle through her insurance, likely providing transportation while her primary vehicle received repairs. Campbell rented the vehicle approximately forty-five minutes after Love returned it to the company. Hertz documented that the vehicle had 1,750 miles at the time it was returned and 1,760 miles at the time that Campbell received the vehicle.

Smith stated that, although it is common for individuals to leave behind items such as sunglasses and cameras in a rental vehicle, it is very uncommon for someone to leave behind illegal drugs. In his twenty-one

years of experience at Hertz, he could not remember a situation in which illegal drugs were found upon the return of a rental vehicle.

Id. at *5-9.

On direct appeal of his conviction to this court, the Petitioner argued, in pertinent part, that the trial court erred by allowing the State to admit the text messages from the cellular telephones into evidence at trial because the search of the telephones exceeded a permissible search incident to arrest. Id. at *16. Initially, this court noted that it was unclear from the record whether the police found the telephones on the codefendants' persons or in the rental car. Id. Regardless, this court concluded that the searches of the telephones were proper as a valid search incident to arrest if the telephones were found on the codefendants' persons and that the searches were proper pursuant to Marcus Harper's consent to search the vehicle if the telephones were found in the rental car. Id.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief, arguing that he received the ineffective assistance of trial counsel. Relevant to this appeal, the Petitioner alleged that trial counsel "should have sought interlocutory review of the denial of the suppression motion relative to the warrantless search of his cell phone." The post-conviction court appointed counsel, and post-conviction counsel did not file an amended petition.

At the outset of the evidentiary hearing, post-conviction counsel advised the post-conviction court that the Petitioner's "strongest basis" for post-conviction relief was Riley v. California, 134 S. Ct. 2473 (2014), which the United States Supreme Court filed after the Petitioner's direct appeal of his conviction concluded. Post-conviction counsel then called trial counsel as the Petitioner's only witness.

Trial counsel testified that the Petitioner retained her to represent him at his 2010 jury trial and that he was tried with his codefendant, Harper, who was the Petitioner's nephew. Trial counsel said that the police "looked into the [Petitioner's] cell phone" and that she raised an issue with regard to the warrantless search of the telephone before trial. However, Judge Rebecca Stern denied relief, and the jury heard about text messages recovered from the telephone. Post-conviction counsel asked trial counsel if the text messages were "very inculpatory," and trial counsel answered, "I don't recall today the exact content of the cell phone, but I know that there was information in there that might lead the authorities to believe that my client was involved in inappropriate criminal activity." She later stated that the text messages "clearly would have been inculpatory and damaging."

Trial counsel acknowledged that the Petitioner's defense was that someone who rented the car from Hertz prior to the Petitioner's girlfriend left the cocaine in the car. Trial counsel filed a motion to suppress the search of the car "where we addressed the issue of him being held on the side of the road longer than necessary." Judge Stern denied the motion, and trial counsel did not file an interlocutory appeal of the trial court's ruling.

On cross-examination, trial counsel testified that at the time of the Petitioner's trial, she had been practicing law about fourteen years. She subpoenaed the Petitioner's girlfriend to the hearing on the motion to suppress the search of the rental car, and she reviewed the police officer's dashcam video of the stop in preparation for trial. After the trial court denied the Petitioner's motion to suppress the search of the car, trial counsel filed a motion in limine to exclude the text messages in the cellular telephones from evidence at trial. Trial counsel said she did not remember any Tennessee case law at the time of the Petitioner's trial that required a warrant for the search of a cellular telephone incident to arrest.

Trial counsel acknowledged that CPD officers, Drug Enforcement Administration representatives, and a TBI forensic scientist testified at trial for the State. She also acknowledged that the text messages from the cellular telephones were not the only inculpatory evidence introduced at trial and that the police dashcam video recorded "an admission of some sorts." She explained,

> We had been provided a CD or DVD of the search of the vehicle, to my recollection, and also a recording of [the defendant] and his codefendant in the back of the police car. At the time it was initially provided to me you were not able to interpret any significant admissions made by the defendant and/or the codefendant; however, shortly before trial the district attorney's office themselves or they had a representative clean that recording up to the point where you could then hear the defendant making an admission that to my recollections was in the -- from a standpoint where the defendant said something to the effect that I hope they don't look under the back seat. Something to that nature. Once the recording was cleaned up shortly before trial that was what the nature of the admission was.

Trial counsel acknowledged that the Petitioner made the inculpatory statement while the police officer was searching the rental car. Trial counsel said that she filed another motion in limine to exclude the "cleaned up version" of the recording but that Judge Stern overruled it. The State played the recording for the jury and introduced it into evidence at trial.

Relevant to this appeal, post-conviction counsel argued that the Petitioner was entitled to relief because Riley, which prohibits the warrantless search of an arrestee's cellular telephone incident to arrest, applied retroactively. In a written order, the post-conviction court analyzed the issue pursuant to Bush v. State, 428 S.W.3d 1 (Tenn. 2014), and denied the petition.

## II. Analysis

On appeal, the Petitioner asserts that Riley "undeniably" established a new rule of constitutional criminal law and must be applied retroactively. The State argues that the post-conviction court correctly held that Riley does not apply retroactively. We agree with the State.

Generally, "[r]elief under [the Post-Conviction Procedure Act] shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id.; see Bush, 428 S.W.3d at 16 (holding that whether a case requires retroactive application is a question of law that we review de novo).

"A warrantless search is presumed unreasonable under both the federal and the state constitutions, and evidence seized from the warrantless search is subject to suppression unless the State demonstrates by a preponderance of the evidence that the search was 'conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Chearis, 995 S.W.2d 641, 643 (Tenn. Crim. App. 1999) (quoting State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998)). Two exceptions to the warrant requirement include a search incident to arrest and a search conducted pursuant to consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). On June 25, 2014, eight months after our supreme court denied the Petitioner's application for permission to appeal his conviction, the United States Supreme Court held in Riley that generally, a warrant is required to search a cellular telephone even when the telephone is seized incident to arrest. 573 U.S. at 2493. Shortly thereafter on July 1, 2014, Tennessee Code Annotated section 40-6-110(b)(1), which provides that law enforcement must obtain a search warrant in order to "search, examine, extract, or duplicate any cellular telephone data," took effect.

The post-conviction court considered the retroactivity of Riley by following our supreme court's analysis in Bush v. State. In Bush, the court held that "the retroactivity

of new constitutional rules in post-conviction proceedings should henceforth be determined using [Tennessee Code Annotated section] 40-30-122," which provides:

> For purposes of this part, a new rule of constitutional criminal law is announced if the result is not dictated by precedent existing at the time the petitioner's conviction became final and application of the rule was susceptible to debate among reasonable minds. A new rule of constitutional criminal law shall not be applied retroactively in a post-conviction proceeding unless the new rule places primary, private individual conduct beyond the power of the criminal law-making authority to proscribe or requires the observance of fairness safeguards that are implicit in the concept of ordered liberty.

428 S.W.3d at 16.

Initially, we note that the Petitioner contends that the holding in Bush is inapposite to the instant case because the Bush decision included an issue for due process tolling of the statute of limitations, whereas the petition for post-conviction relief in this case was timely filed. We disagree with the Petitioner. Our supreme court plainly stated in Bush that "Tenn. Code Ann. § 40-30-122 governs the retroactive effect of Tennessee appellate decisions to post-conviction petitioners." Id. None of the language in Bush limited the statute's application to late-filed post-conviction petitions in which due process tolling was an issue. Id. Moreover, as noted by the State, this court has previously applied Tennessee Code Annotated section 40-30-122 pursuant to Bush to a case involving a timely-filed petition for post-conviction relief. See Ronnie Lamont Harshaw v. State, No. E2015-00900-CCA-R3-PC, 2017 WL 1103048, at *12 (Tenn. Crim. App. at Knoxville, Mar. 24, 2017). Therefore, we turn to the first question we must answer in determining whether Riley applies retroactively pursuant to Tennessee Code Annotated section 40-30-122: whether Riley announced a new rule of constitutional criminal procedure.

The post-conviction court found that Riley announced a new rule of constitutional criminal procedure. We agree with the post-conviction court. This court's unpublished opinion in the Petitioner's direct appeal of his conviction was the first and only case we have found to address the search of a defendant's cellular telephone incident to arrest. In its analysis, this court considered that several federal jurisdictions had upheld such searches. Dane Sayles, No. E2012-00138-CCA-R3-CD, 2013 WL 1870058, at *16. Riley, filed by the United States Supreme Court eight months after our supreme court denied the Petitioner's application for permission to appeal, directly contradicted this court's and other courts' opinions that law enforcement could search a defendant's cellular telephone incident to lawful arrest. Therefore, the Riley issue was subject to debate and was not dictated by precedent. Accordingly, Riley announced a new rule of

constitutional criminal procedure, and we turn to whether retrospective application of the new rule is required.

A new rule of constitutional criminal law shall be applied retroactively if the new rule "places primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." Tenn. Code Ann. § 40-30-122. As our supreme court explained,

> Examples of this type of rule include <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003), in which the United States Supreme Court held that states could not criminalize homosexual intercourse between consenting adults, and <u>Roe v. Wade</u>, 410 U.S. 113 (1973), in which the United States Supreme Court held that states could not in most cases criminally penalize doctors for performing early-term abortions.

<u>Bush</u>, 428 S.W.3d at 17. The post-conviction court correctly found that <u>Riley</u>, which addresses the procedural requirement that law enforcement obtain a warrant before searching the contents of a cellular telephone, does not fall into this category.

Alternatively, a new rule of constitutional criminal law shall be applied retroactively in a post-conviction proceeding if the new rule "requires the observance of fairness safeguards that are implicit in the concept of ordered liberty." Tenn. Code Ann. § 40-30-122. The post-conviction court found that <u>Riley</u> also does not fall into this category. Again, we agree with the post-conviction court.

In <u>Bush</u>, our supreme court held that the phrase "requires the observance of fairness safeguards that are implicit in the concept of ordered liberty" equates to the <u>Teague v. Lane</u> standard's "'watershed rules of criminal procedure'" or "'those new procedures without which the likelihood of an accurate conviction is seriously diminished.'" 428 S.W.3d at 20 (quoting <u>Teague v. Lane</u>, 489 U.S. 288, 313 (1989)). <u>Riley</u> is not a watershed rule of criminal procedure. Instead, the rule clarifies that, due to the amount of personal information stored in modern cellular telephones, the Fourth Amendment generally requires that officers secure a warrant before searching those telephones; the long-standing search incident to arrest exception to the warrant requirement does not apply. <u>Riley</u>, 573 U.S. at 385-86. Likewise, <u>Riley</u> does not amount to a fairness safeguard implicit in the concept of ordered liberty. "Rules governing the collection of evidence do not cut to the heart of guilt or innocence." <u>Cross v. Gilmore</u>, 164 F. Supp. 3d 818, 823 (E.D. Va. 2016). Furthermore, the <u>Riley</u> rule "is not necessary to prevent the risk of inaccurate convictions, as 'whether an investigation violated the Fourth Amendment has no bearing on whether the defendant is guilty.'" <u>Walter Carter v. U.S.</u>, No. 1:09-CR-103-HSM-SKL-1, 2018 WL 1387065, at *6 (E.D. Tenn. Mar. 19,

2018).  Thus, we conclude that the post-conviction court correctly determined that <u>Riley</u> does not apply retroactively.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE